# Exhibit 6

Exhibit 6 Page 32



**DEPARTMENT OF VETERANS AFFAIRS**

# OFFICE OF INSPECTOR GENERAL

*Office of Special Reviews*

VETERANS BENEFITS ADMINISTRATION,
EDUCATION SERVICE

# Former Education Service Executive Violated Ethics Rules and Her Duty to Cooperate Fully with the OIG

| ADMINISTRATIVE INVESTIGATION | REPORT #21-02076-119 | MARCH 24, 2022 |
| --- | --- | --- |

Exhibit 6 Page 33

 

**MISSION**

The mission of the Office of Inspector General is to serve veterans and the public by conducting meaningful independent oversight of the Department of Veterans Affairs.

*In addition to general privacy laws that govern release of medical information, disclosure of certain veteran health or other private information may be prohibited by various federal statutes including, but not limited to, 38 U.S.C. §§ 5701, 5705, and 7332, absent an exemption or other specified circumstances. As mandated by law, the OIG adheres to privacy and confidentiality laws and regulations protecting veteran health or other private information in this report.*



FOR MORE
VA OIG REPORTS
**CLICK HERE**

**Report suspected wrongdoing in VA programs and operations to the VA OIG Hotline:**

**www.va.gov/oig/hotline**

**1-800-488-8244**

Exhibit 6 Page 34



# Executive Summary

On April 2, 2021, the Office of Inspector General (OIG) received a referral from Senator Charles E. Grassley that contained allegations of ethical violations and other potential misconduct by officials in the Veterans Benefits Administration (VBA). These included potential ethical violations by the former executive director of VBA's Education Service, Charmain Bogue, arising from her spouse's consulting work with Veterans Education Success (VES), a nonprofit advocacy organization for veterans' education that regularly had business before the Education Service. The allegations also pointed to possible incomplete financial disclosures concerning the business owned by Ms. Bogue's spouse.[1] In the course of the OIG's administrative investigation into these matters, investigators uncovered evidence of other potential conflicts of interest and related misconduct by Ms. Bogue. She resigned from VA in January 2022.

As a result of this investigation, the OIG made four findings. First, the OIG found that during the period her spouse worked for VES, Ms. Bogue participated in VES-related matters without considering whether her recusal was required in light of the potential appearance of a conflict of interest—a violation of government ethics rules. This included two instances in early 2019 when Ms. Bogue was directly asked by her spouse to address VES's data requests to the Education Service that had gone unanswered. According to Ms. Bogue, in May 2019, she received advice from her supervisors allowing her to participate in VES-related matters because VES did not have a contract or memorandum of understanding (MOU) with VA, so long as she treated VES like any other entity appearing before the Education Service. However, she failed to abide by the terms of that approval in a matter involving an MOU between VBA and a nongovernmental entity used to support a data-sharing project involving VES. This too resulted in a violation of the apparent conflict rule because she did not evaluate whether her impartiality could reasonably be questioned in this instance. The OIG could not substantiate the existence of an actual conflict of interest based on the available documentary and testimonial evidence.[2]

In a second finding, although not part of Senator Grassley's referral, the OIG identified a November 2020 email from the president of VES to a colleague, indicating that Ms. Bogue and her spouse pressured the VES president not to terminate her spouse's contract with VES immediately in response to media articles alleging a conflict of interest arising from his work for VES. Ms. Bogue denied any such communication. A determination could not be reached as to

---

[1] Senator Grassley's April 2, 2021, letter raised several allegations of misconduct directed at individuals other than Ms. Bogue. The OIG did not investigate those allegations at this time. Some of those allegations could be more fully addressed by other governmental entities, some lacked adequate specificity, and some called for broad reviews beyond the specific allegations raised. See appendix A for more information on the scope of this investigation.

[2] The OIG's investigation was hampered by a lack of cooperation from VES and Ms. Bogue's spouse. While VES and Mr. Bogue's consulting firm produced documents in response to an OIG subpoena, the VES president and Mr. Bogue declined the OIG's requests for interviews. The OIG lacks testimonial subpoena authority and, as a result, could not compel their cooperation.

Exhibit 6 Page 35

whether Ms. Bogue violated the prohibition on using her public office for private gain by asking VES to delay termination of her husband's contract. This was because individuals with personal knowledge of the events, including Ms. Bogue's spouse and the VES president, did not cooperate with the OIG's requests for interviews and the OIG lacks authority to compel testimony from individuals who are not VA employees.

The OIG also identified email correspondence from November 2020 showing that Ms. Bogue provided her résumé to the VES president, who then promptly included Ms. Bogue among a series of candidates VES recommended for consideration as potential presidential appointees to the staff of multiple congressional offices. Ms. Bogue told OIG investigators that she did not know about these endorsements and instead sent her résumé to the VES president for feedback to assist with her search for career federal jobs. As noted above, the VES president refused to be interviewed by the investigators. The OIG could not reconcile Ms. Bogue's testimony with documentary evidence suggesting she may have known that VES's president was using her résumé to recommend her for political appointments. Resolving this question was not essential because even under Ms. Bogue's version of events, seeking résumé feedback from the president of an entity making regular requests of her office to improve her job prospects raised concerns about Ms. Bogue's impartiality towards VES in future matters. Ms. Bogue did not consult her supervisors or agency ethics counsel before sending her résumé to the VES president, nor did she consider whether her impartiality could reasonably be questioned in addressing later VES requests to the Education Service. As a result, she violated the apparent conflict rule.

Third, in response to Senator Grassley's referral, the OIG found that Ms. Bogue failed to disclose sufficient information concerning her spouse's business on her financial disclosure reports for 2019 and 2020. According to Ms. Bogue, the error was inadvertent. OIG investigators identified no evidence suggesting otherwise. After the deficiencies were brought to her attention, she remedied that issue in her 2021 disclosure.

Finally, Ms. Bogue refused to complete a follow-up interview with the OIG. Federal law and VA policy require agency employees to cooperate with OIG investigations, including providing testimony, subject to their Fifth Amendment right against self-incrimination. Ms. Bogue's refusal to participate in the remainder of her follow-up interview was in direct contravention of her duties as a VA employee. Her conduct hindered the OIG's investigation and, by extension, its efforts to fulfill its statutory oversight mission.

Because Ms. Bogue resigned from VA, the OIG makes no recommendations with respect to her misconduct.

## VA Comments and OIG Response

VBA's deputy under secretary for policy and oversight provided a written response to this report in which he concurred with the OIG's findings without comment. A copy of VA's response can

be found in appendix B. In light of VA's full concurrence, no additional OIG response is provided.

R. JAMES MITCHELL, ESQ.
Acting Assistant Inspector General
for Special Reviews

Former Education Service Executive Violated Ethics Rules and Her Duty to Cooperate Fully with the OIG

# Contents

Executive Summary ................................................................................................................... i

Abbreviations .......................................................................................................................... v

Introduction .............................................................................................................................1

Findings and Analysis .............................................................................................................3

    Finding 1:   Ms. Bogue Participated in Matters Involving Her Spouse's Employer without Considering an Apparent Conflict of Interest and Acted Contrary to Ethics Guidance She Received .........................................................................................3

    Finding 2:   Ms. Bogue's Interactions with the VES President Violated the Apparent Conflict Rule but the OIG Cannot Substantiate Whether She Used Her Public Office for Private Gain ............................................................................................................14

    Finding 3:   Ms. Bogue Provided Insufficient Detail about Her Spouse's Business in 2019 and 2020 Public Financial Disclosures but Remedied It ......................................19

    Finding 4:   Ms. Bogue Refused to Cooperate Fully in the OIG's Investigation ....................21

Conclusion .............................................................................................................................23

VA Comments and OIG Response .........................................................................................25

Appendix A: Scope and Methodology ...................................................................................26

Appendix B: VA Management Comments ..............................................................................28

OIG Contact and Staff Acknowledgments ............................................................................30

Report Distribution ...............................................................................................................31

Exhibit 6 Page 38

# Abbreviations

| | |
|---|---|
| MOU | memorandum of understanding |
| NSC | National Student Clearinghouse |
| OIG | Office of Inspector General |
| VBA | Veterans Benefits Administration |
| VES | Veterans Education Success |



# Introduction

On April 2, 2021, Senator Charles E. Grassley, Ranking Member of the Senate Committee on the Judiciary, wrote to Inspector General Michael J. Missal, requesting that the VA Office of Inspector General (OIG) investigate allegations that a conflict of interest may have arisen out of the relationship between the then executive director of the Veterans Benefits Administration (VBA) Education Service, Charmain Bogue, and her spouse's business activities. Ms. Bogue resigned from VA in January 2022.

In response to Senator Grassley's referral, the OIG initiated an administrative investigation examining the allegations that Ms. Bogue may have failed to recuse herself from official business related to her spouse or entities associated with him, despite receiving an opinion from VA ethics officials warning of potential conflicts of interest in those circumstances. The OIG also reviewed the allegation that Ms. Bogue may have inadequately disclosed information about her spouse's business activities in her annual public financial disclosure reports.[3]

During its investigation, the OIG discovered evidence that Ms. Bogue may have participated in efforts by the president of Veterans Education Success (VES) to endorse her for a presidentially appointed position at VA. VES is an organization that contracted with Ms. Bogue's spouse to serve as a consultant and regularly had business pending before Ms. Bogue's office. In addition, the OIG identified evidence that Ms. Bogue may have intervened to delay the termination of her spouse's contract with VES. The OIG expanded the scope of its investigation to examine these issues.

VBA's Education Service promulgates regulations and policy relating to educational assistance benefits, manages the distribution of those benefits, and oversees institutions receiving them. It distributed nearly $12 billion in benefits during fiscal year 2020 to nearly 900,000 beneficiaries. The Education Service is led by an executive director who is a member of the senior executive service and reports to the deputy under secretary for policy and oversight.[4] Ms. Bogue became the acting executive director of the Education Service in January 2019 and was appointed to that role in a permanent capacity in May 2019.[5] Before becoming executive director, Ms. Bogue served for five years as a deputy director for the Education Service.

---

[3] Senator Grassley's letter made additional allegations directed at VA officials other than Ms. Bogue. The OIG did not initiate an investigation as to those allegations at this time. Some of those allegations could be more fully addressed by other oversight entities, some lacked adequate specificity, and some called for broad reviews beyond the specific allegations raised. See appendix A for more information on the scope of this investigation.

[4] Members of the senior executive service provide their agencies with strategic leadership in areas such as guiding employees to meet the agency's vision, managing limited resources, and building coalitions with partners both within and outside the federal government.

[5] When serving as executive director in an acting capacity, Ms. Bogue was a GS-15 employee. She became a senior executive in May 2019. Several documents, including emails and personnel documents, indicated that she became

Exhibit 6 Page 40

In July 2018, Ms. Bogue's spouse founded and became president of a limited liability company that provides consulting services to organizations serving the veteran community. From November 2018 to January 2021, one of Mr. Bogue's clients was VES. VES is a nonprofit that advocates on matters before the Education Service, including seeking policy, regulatory, or legislative action relating to veterans' education, requesting relief for veterans with concerns about their education benefits, and asking the Education Service to take action against schools VES alleges are in violation of law. VES also produces research on veterans' education issues and provides assistance to student veterans and whistleblowers. VES hired Mr. Bogue as a part-time contractor to serve as VES's senior communications advisor.

The OIG could not obtain all information relevant to the allegations under review because several individuals with firsthand knowledge—including the VES president and Mr. Bogue—were not VA employees and refused to be interviewed. The OIG lacks testimonial subpoena authority and therefore could not compel their cooperation. Further, as detailed below, Ms. Bogue herself failed to fully cooperate in providing testimony to the OIG and then resigned from VA in January 2022. Nevertheless, the OIG had sufficient evidence to support the four key findings in this report:

1. Ms. Bogue participated in matters involving her spouse's employer without considering whether it raised an apparent conflict of interest and acted contrary to ethics guidance she received from her supervisors.

2. Ms. Bogue sought résumé feedback from the VES president to aid in her search for career federal jobs without considering whether this raised appearance concerns in subsequent VES matters, in violation of the apparent conflict of interest rule. The OIG could not substantiate whether she used her public office for private gain.

3. Ms. Bogue provided insufficient detail about her spouse's business in 2019 and 2020 public financial disclosures but remedied it in her 2021 disclosure.

4. Ms. Bogue refused to cooperate fully in the OIG's investigation.

---

acting executive director in late 2018, but Ms. Bogue told OIG investigators that she took on the acting role in January 2019. This discrepancy had no material effect on the allegations under review.

# Findings and Analysis

## Finding 1: Ms. Bogue Participated in Matters Involving Her Spouse's Employer without Considering an Apparent Conflict of Interest and Acted Contrary to Ethics Guidance She Received

By law, an executive branch employee may not participate personally and substantially in a particular matter that, to the employee's knowledge, could directly and predictably affect their financial interest, or that of their spouse, unless they receive a written waiver or the financial interest is exempt.[6] Such a disqualifying financial interest is sometimes termed an "actual" conflict of interest. In addition to prohibiting actual conflicts of interest, federal regulations prescribe certain procedures government employees must follow to avoid the appearance of bias in the performance of their official duties, also known as an "apparent" conflict of interest.[7] Ms. Bogue received annual ethics training that covered both these topics.

The OIG found that Ms. Bogue violated the apparent conflict rule in some instances when participating in VES-related matters before the Education Service. This finding was based on the following determinations:

- During the period her spouse worked for VES, Ms. Bogue participated in Education Service matters in which VES or her spouse was, or represented, a party. She was required under the ethics rules to follow specific procedures to assess whether a reasonable person would question her impartiality in such matters, and to seek and adhere to an authorization or recuse herself when an apparent conflict arose.

- In May 2019, Ms. Bogue purportedly received approval from her then supervisors to participate in VES-related matters because VES did not have a contract or memorandum of understanding (MOU) with VA, as long as she treated VES like any other entity appearing before her. However, she acted inconsistently with this advice in one matter involving an MOU that VES was pursuing with VA, and consequently violated the apparent conflict rule.

- Ms. Bogue also failed to consider whether her impartiality could be questioned in VES matters prior to May 2019 despite several instances warranting such consideration, such as when her spouse contacted her directly to make requests on behalf of VES.

---

[6] 18 U.S.C. § 208; 5 C.F.R. § 2635.402(a), (d); 5 C.F.R. Part 2640, Subparts B, C.

[7] 5 C.F.R. § 2635.502(a).

- The OIG cannot substantiate the existence of an actual conflict of interest because of insufficient evidence caused in part by Mr. Bogue's and VES's refusal to fully cooperate.[8]

## The Ethics Rules Required Ms. Bogue to Follow a Defined Process in Evaluating Potential Apparent Conflicts of Interest

The Standards of Ethical Conduct for Employees of the Executive Branch govern the conduct of executive branch employees and require that they "place loyalty to the Constitution, laws and ethical principles above private gain."[9] This includes avoiding any actions that create "the appearance that they are violating the law or the ethical standards. . . ."[10]

The apparent conflict rule exists to "ensure that an employee takes appropriate steps to avoid an appearance of loss of impartiality in the performance of [their] official duties."[11] The rule provides,

> Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of the appearance problem and received authorization from the agency designee. . . .[12]

As is relevant here, Ms. Bogue had a "covered relationship" with VES because the definition includes an organization "for whom the employee's spouse . . . is, to the employee's knowledge,

---

[8] The OIG *substantiates* allegations when the facts and findings support that the alleged events or actions took place. The OIG *does not substantiate* allegations when the facts show the allegations are unfounded. The OIG *cannot substantiate* allegations when there is no conclusive evidence to either sustain or refute the allegation.

[9] 5 C.F.R. § 2635.101(a).

[10] 5 C.F.R. § 2635.101(b)(14).

[11] 5 C.F.R. § 2635.501(a).

[12] 5 C.F.R. § 2635.502(a). A nonprofit like VES does not have a financial interest in a particular matter merely because it spends money to advocate a position on the policy at issue in the matter. Instead, it has a policy interest in the matter. Such an interest cannot create a disqualifying financial interest, but it can raise appearance concerns. Office of Legal Counsel, *Financial Interests of Nonprofit Organizations for Purposes of 18 U.S.C. § 208*, January 11, 2006.

serving or seeking to serve as [a] . . . consultant, contractor or employee."[13] She also had a covered relationship with her spouse because he was "a member of [her] household."[14]

Absent approval from a designated VA official, the apparent conflict rule would have required Ms. Bogue to recuse herself from particular matters in which VES or her spouse was, or represented, a party, if she determined that a reasonable person with knowledge of the relevant facts would question her impartiality. As discussed below, Ms. Bogue failed to consider this question in certain instances. Furthermore, in another instance, she acted contrary to advice provided to her by agency designees and consequently failed to satisfy her ethical obligations.

## Ms. Bogue Was Aware of Her Ethical Obligations to Act Impartially and to Avoid Actions Creating the Appearance That She Was Giving Preferential Treatment

Ms. Bogue told the OIG that she completed annual ethics training required of all VA employees. She also stated that she took ethics training for VA senior executives who must file annual public financial disclosure reports. These training programs covered the rules described above concerning actual and apparent conflicts of interest. The programs advised that an employee with questions about a potential ethics issue should contact agency ethics officials for guidance before taking action.[15] Ms. Bogue told OIG investigators that she understood the general principles behind the apparent conflict rule, including the need to avoid situations in which she appeared to have a conflict of interest with respect to organizations that came before the Education Service and to maintain the appearance of being impartial toward those organizations.

In addition to VA's ethics trainings, Ms. Bogue received advice from VA ethics counsel and her then supervisors concerning her spouse's business activities before she became executive director of the Education Service. In December 2017, a colleague of Ms. Bogue at VA contacted VA ethics counsel. According to that colleague, the Education Service was preparing to seek bids on a contract within a program managed by Ms. Bogue, who was then a GS-15 deputy director within the Education Service. The colleague expressed a concern that the organization Ms. Bogue's spouse worked for at that time (which was not VES) might bid on the contract. Agency ethics counsel issued guidance to Ms. Bogue, advising her to recuse herself from the matter if her spouse's employer submitted a bid, based on the risk of an apparent conflict of interest.

---

[13] 5 C.F.R. §§ 2635.502(b)(1)(iii), 2635.102(k). Although this rule uses the noun "person," the ethics rules broadly define "person" to include an individual, corporation, or any other organization or institution, whether for-profit or nonprofit. 5 C.F.R. § 2635.102(k).

[14] 5 C.F.R. § 2635.502(b)(1)(ii).

[15] The ethics regulations and VA ethics guidance contain similar admonishments. *See* 5 C.F.R. §§ 2635.107(b), 2640.205; VA Handbook 5025/2, *Legal*, Part IV.1.b, June 16, 2004.

Ms. Bogue recalled receiving her colleague's email but told OIG investigators that it was confusing because her husband's employer was not going to be bidding on the contract and her colleague did not consult her before reaching out to ethics counsel. She told the OIG that she talked to her then supervisors about the situation. According to Ms. Bogue, those individuals spoke to the head of the organization her husband worked for and confirmed that the organization would not be bidding on the contract. She told OIG investigators that her supervisors then told her to "continue business as usual."

Finally, Ms. Bogue also told OIG investigators that she understood the ethics rules "intensified once you became a senior executive." This is consistent with VA policy, which requires that members of the senior executive service "foster high ethical standards in meeting the organization's vision, mission, and goals."[16] Similarly, the Office of Personnel Management notes that a fundamental competency of a government senior executive is integrity and honesty. This requires that the executive "behaves in an honest, fair, and ethical manner" and "models high standards of ethics."[17]

## Agency Designees Reportedly Approved Ms. Bogue's Participation in VES Matters Because VES Did Not Have a Contract or MOU with VA

Ms. Bogue told OIG investigators that in May 2019, when she was deciding whether to accept the offer to hold her position permanently, she had separate in-person meetings with her then first- and second-line supervisors "to make sure there was no concern around conflict of interest" arising from her spouse's work for VES.[18] According to Ms. Bogue, in each meeting, she explained that Mr. Bogue owned a consulting firm that provided services to VES. Ms. Bogue testified to OIG investigators that each supervisor replied in substance that "they didn't see it as an issue because of the fact that there was no contract or MOU directly with [VES] as long as [she] treated that organization as [she] would any other organization."

The OIG requested documentation corroborating the occurrence of these meetings, but Ms. Bogue was unable to furnish any. Ms. Bogue's then first-line supervisor, the former principal deputy under secretary for benefits, did not recall having any such meeting, and her then second-line supervisor, the former under secretary for benefits, did not respond to OIG requests for an interview.[19] However, Ms. Bogue testified consistently about the nature and

---

[16] VA Handbook 5027, *Senior Executive Service*, Part III, appendix A (April 15, 2002).

[17] Office of Personnel Management, *Guide to Senior Executive Service Qualifications*, at 5 (September 2012).

[18] From the time she became acting executive director until April 2021, Ms. Bogue reported to the principal deputy under secretary for benefits, who in turn reported to the under secretary for benefits. VBA created a new position, the deputy under secretary for policy and oversight, in April 2021. Since that time, Ms. Bogue reported directly to that official, who in turn reports to the principal deputy under secretary for benefits.

[19] The OIG made several attempts to contact the former under secretary for benefits, who no longer works at VA. Those attempts were not successful. The OIG lacks testimonial subpoena power to compel a person who does not work at VA to speak with its personnel.

---

Exhibit 6 Page 45

contents of these discussions on multiple occasions during two interviews that occurred nearly eight months apart.[20] Additionally, other individuals interviewed told the OIG that Ms. Bogue had made prior statements about discussions with her supervisors concerning her spouse's work for VES. An Education Service manager told OIG investigators that around the time Ms. Bogue formally took on the role of executive director in May 2019, he asked her, "how [do] [your spouse's] activities square with you here," to which she replied that she had made VBA leaders aware and that "there [were] no concerns." The former vice president of VES told OIG investigators that during a conversation with Ms. Bogue in early or mid-2020, Ms. Bogue stated that she had received approval from her supervisors to continue in her work after their consideration of the potential for an apparent conflict.

Assuming that Ms. Bogue received advice from her supervisors—who were agency designees authorized to provide guidance under the apparent conflict rule—that her participation in VES-related matters would not create appearance problems because VES did not have a contract or MOU with the agency, Ms. Bogue was entitled to rely on that advice in performing her duties. When an agency designee has information concerning a potential appearance of a conflict of interest, they may make an independent determination as to whether a reasonable person with knowledge of the relevant facts would question the employee's impartiality in a matter.[21] If the agency designee determines that the employee's impartiality is not likely to be questioned, they may advise the employee that their participation would be proper.[22] Thus, consistent with her supervisors' purported advice, because VES did not have a contract or MOU with VA, Ms. Bogue could participate in any VES matter, as long as she treated VES like any other organization with business before her.[23]

## Ms. Bogue Violated the Apparent Conflict Rule When She Participated in the Approval of an MOU to Benefit VES

OIG investigators identified one VES-related matter in which Ms. Bogue's participation did not comport with her supervisors' May 2019 direction. At the time of the purported advice, no contract or MOU existed between VES and VA. Yet, an email from the VES president reflects that in November 2019, VES and Ms. Bogue negotiated the terms of an MOU between VBA and another outside entity, in which VES was intended to be a named party. According to that email, after learning VES was named in the MOU, Ms. Bogue did not recuse herself. Instead, she advised the VES president that she could clear the MOU with her superiors if VES was not

---

[20] Ms. Bogue was on family leave during this period and was unavailable for an earlier second interview.

[21] 5 C.F.R. § 2635.502(c).

[22] 5 C.F.R. § 2635.502(c)(2).

[23] For the analysis that follows, the report considers that even if the supervisors' advice was given as reported by Ms. Bogue, her actions did not comply with their guidance. Doing so does not, however, concede the advice was provided as she purports.

named (which, as described below, is what ultimately occurred). The OIG found that by Ms. Bogue's characterization of the advice she received, her supervisors conditioned her involvement with VES on the absence of an MOU or contract. Whether the MOU already existed or was being negotiated, Ms. Bogue's participation would raise concerns about whether her loyalty was divided between the government on one side of the agreement, and her spouse's employer on the other.

VES's pursuit of the MOU spanned much of Ms. Bogue's tenure, from at least December 2018 to January 2020, and on multiple occasions involved communications directly between the VES president and Ms. Bogue. Emails reflect that as early as December 2018, the VES president was emailing Ms. Bogue to facilitate VBA's participation in a data-sharing project involving the National Student Clearinghouse (NSC).[24] The project's purpose was to allow VBA to share data on student veterans so that it could evaluate student outcomes and civilian employment success. Additionally, the project would feed data into an existing project between VA and the US Census Bureau. VES received Special Sworn Status from the Census Bureau to access the data and worked to secure funding for the project.

In a December 2018 email, the VES president asked Ms. Bogue to encourage VA employees to take action on finalizing the MOU that would enable the project. Ms. Bogue reported back on the status of the matter to the VES president in just over two hours. Later that month, the VES president asked for another push from Ms. Bogue to "keep things moving" on the MOU, noting that the previous effort had "moved things along."

In November 2019, the VES president emailed staff from the NSC and a nongovernmental entity involved in the data-sharing project, reporting,

> Charmain read the MOU…. She thinks she can get sign-off. Here's what she needs: At the bottom of page 7, delete the following: "to researchers from . . . Veterans Education Success, and the NSC who have been granted Special Sworn Status by Census pursuant to 13 U.S. Code Section 23(c) for purposes of producing research of Aggregated Data consistent with the Project Purpose;"

> She thinks easier to clear it by her leadership if the [Special Sworn Status] entities aren't named. She says it's fine that Census is granting [Special Sworn Status] to some researchers, but it doesn't matter who, and better for her leadership if the [entities] aren't named.

---

[24] The NSC is a nonprofit and nongovernmental organization that provides educational reporting, data exchange, verification, and research services. Its role in the project would be to receive student data from VBA, match it with data held by the NSC, and send the matched data back to VBA so it could be transferred to the US Census Bureau.

The VES president noted in a separate email to Ms. Bogue that day that references to VES had been deleted from the MOU. In January 2020, the MOU was signed and completed, with Ms. Bogue as one of the signatories.

In participating in negotiations over the MOU, Ms. Bogue was aware that VES was initially named in the agreement. Her participation was therefore not consistent with her supervisors' May 2019 advice, as her supervisors relied on the absence of such an agreement in approving her participation in VES-related matters. Because she was working to establish the very relationship her supervisors saw as ethically problematic, their approval would not apply to this matter. Although references to VES were ultimately deleted from the agreement, according to the VES president, Ms. Bogue knew that VES would remain a beneficiary of the MOU. Highlighting the concerns that there was an appearance of a conflict of interest, later in November 2019, the VES president wrote to an organization funding the initiative and asked that the grant be modified to avoid direct payments being made from VES:

> One request from VBA was that the payments to National Student Clearinghouse go straight from [a nongovernmental funding entity] to National Student Clearinghouse rather than through VES. They didn't make this a condition of the MOU and it's not mentioned in the MOU, but they would feel more comfortable because a senior VBA official is married to one of my VES staff members and they were worried about conflict of interest.[25]

Notwithstanding these potential appearance concerns and her supervisors' instructions, Ms. Bogue continued to participate as one of the signatories on the MOU.

Having participated in a VES-related matter that fell outside the approval her supervisors previously provided, the apparent conflict rule required Ms. Bogue to consider whether "the circumstances would cause a reasonable person with knowledge of the relevant facts to question [her] impartiality in the matter."[26] Guidance issued by the Office of Government Ethics states that, "if an employee does not take the appearance of impartiality into consideration before acting in Government matters as described in [the apparent conflict rule], he may be subject to appropriate disciplinary measures."[27] OIG investigators asked Ms. Bogue whether she ever again considered appearance issues subsequent to receiving her supervisors' advice in May 2019. Ms. Bogue testified, "No. I had [gone] to my supervisor, I had the conversation. I went to my second line supervisor, who is the Undersecretary for Benefits and had the conversation, and

---

[25] As previously noted, the VES president refused to speak with the OIG, and Ms. Bogue refused to complete her follow-up interview, so the OIG could not discuss this email, or the email quoted above from earlier in November 2019, with either individual.

[26] 5 C.F.R. § 2635.502(a).

[27] Office of Government Ethics (OGE) Informal Advisory Letter 97 x 8, April 22, 1997.

they had no issues. So I just went on as business as usual." Because Ms. Bogue failed to consider whether her recusal was required in this instance, she violated the apparent conflict rule.[28]

### Ms. Bogue Violated the Apparent Conflict Rule When She Took Actions Benefitting Her Spouse's Employer without Considering How Her Conduct Could Be Perceived to Compromise Her Impartiality

Ms. Bogue also violated the apparent conflict rule when she participated in VES-related Education Service matters prior to seeking advice from her supervisors in May 2019. Asked whether she considered any appearance issues arising from her work on VES matters during the pre-May 2019 period, she responded, "No, not in an acting capacity." She told the OIG that she "didn't seek any advice or think anything of it at the time." Because she participated in VES-related matters during this period without assessing whether her impartiality would reasonably be questioned, she failed to comply with the apparent conflict rule.[29]

The OIG found that, in addition to generally failing to evaluate the possibility of an apparent conflict of interest, Ms. Bogue participated in two VES matters prior to May 2019 that raised substantial questions about her ability to act impartially. The first was a January 2019 exchange with her spouse related to a pending data request made by the VES research director to the Education Service. In that instance, Ms. Bogue's spouse emailed her asking, "Could you let me know when your team plans to respond to the questions my client sent?" Ms. Bogue thereafter followed up with the VES research director and ensured her staff answered his questions. Ms. Bogue's direct interaction with her spouse raised appearance questions that merely interacting with VES would not, as she had a covered relationship with him. Moreover, the circumstances indicated that her spouse was trading on his access to Ms. Bogue, since VES had already tried and failed to get a response to the request and her spouse described his outreach in an email to the VES research director as "elevat[ing]" the request.

Ms. Bogue explained her participation in the matter did not cause her concern because she engaged with the VES research director, not her spouse, but this explanation did not align with the requirements of the apparent conflict rule. Ms. Bogue told OIG investigators she did not consider her spouse's email to be an "appropriate channel" for VES requests and told him not to

---

[28] Based on the limited evidence, the OIG was unable to determine whether the negotiation of the MOU, like other VES-related matters before the Education Service, had a direct and predictable effect on a financial interest of Mr. or Ms. Bogue, which could have resulted in violation of the prohibition against an actual conflict of interest. Accordingly, this analysis is confined to the apparent conflict rule. See p. 12.

[29] OIG investigators also asked Ms. Bogue whether she considered the impact of the advice she received from VA ethics counsel in December 2017 during the pre-May 2019 period. She responded, "No, it was a two year difference. I would not have made that connection whatsoever because again in the [December 2017] example you just gave, my supervisor at the time. . .stated this was a non-issue." Ms. Bogue further explained that the December 2017 matter involved the potential for a contract bid involving her husband's then employer and it was her understanding that "if there's no contract, or money exchanged, or anything between that organization and VA then there was no issue or concern at hand."

contact her on a client's behalf again, but did not evaluate whether it raised questions about her impartiality. Asked whether she had a concern about participating in the matter knowing that her spouse had asked her to take action on VES's behalf, Ms. Bogue stated, "No, I did not have a concern" because she engaged with the VES research director, rather than responding to her husband's email. However, the record shows that she did not respond to the data request until her spouse intervened. Ms. Bogue's explanation for continuing to participate in the matter did not address the potential appearance of loss of impartiality, as required under the apparent conflict rule.

A similar issue arose in relation to a March 2019 data request by VES to the Education Service. There again, the VES research director reached out to Ms. Bogue and received no response. The research director then sought assistance from Ms. Bogue's spouse, who used her personal email address to inquire about the request. The same day, she forwarded that email from her personal account to her VA email account.[30] She then followed up by having her staff respond to the data request. Her spouse's use of her personal email address further amplified the appearance problem for Ms. Bogue, as not only was her spouse reaching out to her on behalf of VES, he was also using an access point—her personal email address—that Ms. Bogue claimed other outside groups did not employ for official business. Ms. Bogue communicated to VES the next day that her staff would look into the question, again suggesting that her spouse's involvement prompted Ms. Bogue to focus on the VES request.

Ms. Bogue told the OIG that she never had a concern about a conflict of interest arising from her spouse's work for VES and her interactions with VES because, in her view, she treated VES like any other organization. Several Education Service and former VES employees also told OIG investigators that, in general, Ms. Bogue treated VES similarly to other organizations appearing before the Education Service. However, the apparent conflict rule requires government employees to avoid even the appearance of loss of impartiality. Because Ms. Bogue had a covered relationship with VES and her spouse, unlike other organizations that appeared before her, appearance concerns could arise in VES-related matters that would not arise in similar circumstances involving other entities. Using hindsight to query whether an employee in fact gave preferential treatment runs counter to the purpose of the apparent conflict rule.[31]

---

[30] Ms. Bogue appropriately forwarded this email from her personal account to her VA account in accordance with VA policy. VA Handbook 6301, *Procedures for Handling Electronic Mail Records*, Paragraphs 6(b)(1), 7(c), April 24, 1997.

[31] Nevertheless, Ms. Bogue treating VES like any other entity before Education Service would be consonant with her supervisors' May 2019 advice, as well as one of the governing principles defined in the ethics regulations: "Employees shall act impartially and not give preferential treatment to any private organization or individual." 5 C.F.R. § 2635.101(b)(8).

Exhibit 6 Page 50

## The OIG Cannot Substantiate the Existence of an Actual Conflict of Interest Based on the Available Evidence

As noted above, an actual conflict of interest typically arises when a government employee participates personally and substantially in a particular matter that, to their knowledge, could directly and predictably affect their own, or their spouse's, financial interest.[32] The ethics regulations explain that a disqualifying financial interest can arise from the employee's or their spouse's ownership interest in the party appearing before the employee.[33] According to Ms. Bogue, neither she nor her spouse held any ownership interest in VES, and none of the documentary evidence suggests otherwise.

VES paid Mr. Bogue $5,000 per month, as their contract specified, between November 2018 and November 2020. However, in December 2020, after VES decided to terminate the contract at the end of the year, VES made a lump sum payment of $35,000 to Mr. Bogue. The OIG analysis of budget materials produced by VES revealed that, inclusive of this lump sum, the total payments by VES to Mr. Bogue in 2020 exceeded the budgeted amount by $30,000.

OIG investigators asked Ms. Bogue about her spouse's compensation from VES. She stated that she did not know how much her husband was paid each month, never discussed the issue with him, and did not know of any extra payment VES made to him. She also told investigators that she never reviewed her spouse's contract with VES.

In a January 2022 letter to the OIG, counsel for VES volunteered an unsolicited and unsworn written explanation for the December 2020 payment to Mr. Bogue. According to counsel, VES paid Mr. Bogue $5,000 for services rendered under his contract through December 31, 2020, and made the $30,000 excess payment in December 2020 "in consideration for [VES's] early termination" of the contract, which was otherwise set to expire in November 2021.

Other documentary evidence appears to belie this explanation. Under the terms of the contract, either party could terminate it with 60 days' notice. No consideration was required, or penalty imposed, for early termination. Therefore, at most VES would owe Mr. Bogue $10,000 for the two-month period that followed notification by VES that it would be terminating the contract. Agreement to terminate the contract appears to have been reached no later than November 13, 2020, when the VES president wrote to its board of directors, "[Mr. Bogue] and I agreed to not renew [his] contract for 2021. He and I thought he could continue thru Dec. 2020 as a transition while we hire someone new, but I wonder if you feel we should end the relationship sooner?"

---

[32] 18 U.S.C. § 208; 5 C.F.R. § 2635.402(a), (d).
[33] 5 C.F.R. § 2635.402(b)(1), Note.

Assuming the 60-day period began to run no earlier than November 13, 2020, VES was only contractually obligated to pay Mr. Bogue through January 12, 2021.[34]

In addition to the fact that no consideration for early termination was due under the contract, an email exchange from December 2020 between Mr. Bogue and the VES president calls into question VES's characterization of the payment. In response to Mr. Bogue's email expressing gratitude for the December 2020 payment, VES's president replied, "Thank YOU ! You earned it!" Other internal VES documents also raise potential inconsistencies that could cause a reasonable person to question whether this and other payments made in 2020 to Mr. Bogue were solely compensation for his work. In August 2020, for example, the VES president objected to a colleague's suggestion of paying Mr. Bogue an extra $7,500 to work on a website, saying "[w]e haven't been asking very much of [Mr. Bogue] in recent months; he's way below 20 hours a week for many months" and VES would be "paying him again for what we're already paying him to do." Additionally, in a November 2020 email to a then member of VES's board of directors, the VES president described Mr. Bogue—an individual whom VES employed for strategic communications and public relations—as not being "particularly savvy media-wise." Without clarifying explanatory testimony under oath from Mr. Bogue or the VES president, the OIG could not resolve these seemingly contradictory statements, and both declined requests for OIG interviews.

Under the ethics rules, if VES payments to Mr. Bogue were not contingent on the organization's success in its VA advocacy, then his financial interest would not have been directly and predictably affected by any decision Ms. Bogue might make with respect to VES-related matters.[35] Were that true, and if Ms. Bogue had no reason to believe her official acts in particular matters would affect the compensation VES paid to her spouse, no actual conflict would have arisen. Under Mr. Bogue's contracts with VES, his $5,000 monthly payments were not contingent on VES's success in advocating before VA. However, no available documents or sworn testimony explained the basis for VES's final, excess payment to Mr. Bogue. The OIG considered the unsolicited and unsworn written explanation proffered by VES's counsel but determined that it was not corroborated by the available documentary evidence. Therefore, the OIG cannot determine whether that payment was made to secure a benefit from Ms. Bogue, or for some other purpose, and cannot substantiate whether an actual conflict of interest arose in these circumstances.

---

[34] Other documentary evidence indicates that the VES president had not yet decided to terminate Mr. Bogue's contract as of November 5, 2020, which means the 60-day notice period under the contract would have started running at some point between November 5 and 13.

[35] 5 C.F.R. § 2635.402(b)(2), Example 2.

## Finding 1 Conclusion

The OIG found that Ms. Bogue operated at times under an apparent conflict of interest arising from her spouse's work for VES. According to Ms. Bogue, she disclosed Mr. Bogue's work for VES to her supervisors in May 2019, and they determined that she could participate in VES-related matters because VES did not have a contract or MOU with VA, so long as she treated VES like any other Education Service stakeholder. Assuming she received this advice, she was entitled to rely on it in participating in subsequent VES-related matters. However, before receiving that advice, she consistently failed to consider whether her impartiality could reasonably be questioned, contrary to the requirements of the apparent conflict rule. Further, following receipt of her supervisors' advice, she participated in a matter involving an MOU in which VES was at one point named, and which continued to advance VES's interests after its name was removed from the document. The apparent conflict rule required her to reevaluate her impartiality in this instance because the OIG found that she acted outside the scope of her supervisors' advice. She did not conduct that reevaluation.

The OIG could not substantiate the separate allegation that an actual of conflict of interest arose from Ms. Bogue's participation in VES-related matters due in part to several witnesses' refusal to be interviewed.

## Finding 2:  Ms. Bogue's Interactions with the VES President Violated the Apparent Conflict Rule but the OIG Cannot Substantiate Whether She Used Her Public Office for Private Gain

During this administrative investigation, the OIG identified two additional issues involving Ms. Bogue and VES, not raised by Senator Grassley's referral, that presented potential ethics concerns that are discussed in the sections that follow.

First, in November 2020, the VES president indicated in an email to a then VES board member that both Mr. and Ms. Bogue asked the VES president not to immediately terminate Mr. Bogue's contract with VES in response to two media articles alleging that the contract created a conflict of interest for Ms. Bogue. Executive branch employees may not use their public offices for private gain, and any request by Ms. Bogue to the president of VES seeking to prolong her spouse's contract would fall within this prohibition. Ms. Bogue denied any such communication, however, and Mr. Bogue and the VES president refused to speak with the OIG.

Second, later in November 2020, Ms. Bogue provided her résumé to the VES president, who then endorsed her for a presidentially appointed position at VA. Ms. Bogue denied knowing that the endorsement would occur, stating instead that she provided her résumé to the VES president to get feedback to make her a better candidate for other federal career positions. The OIG could not reconcile Ms. Bogue's testimony with seemingly contrary documentary evidence. However,

Exhibit 6 Page 53

even Ms. Bogue's explanation raised ethics issues with respect to her conduct, including a violation of the apparent conflict rule.

## Ms. Bogue Denied Interceding to Delay VES's Termination of Her Spouse's Contract, Which Would Have Constituted Using Her Public Office for Private Gain

Federal ethics regulations provide that "[a]n employee shall not use his public office for his own private gain . . . or for the private gain of friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity."[36] Thus, the rules provide that "[a]n employee shall not use or permit the use of his Government position or title or any authority associated with his public office in a manner that is intended to coerce or induce another person, including a subordinate, to provide any benefit, financial or otherwise, to himself or to friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity."[37] In her position as executive director, Ms. Bogue had authority over VES requests to the Education Service.

In November 2020, the VES president discussed with colleagues whether to end VES's contract with Mr. Bogue immediately, following two negative media articles published that month.[38] One article alleged a conflict of interest based on Mr. Bogue's work for VES, while the other claimed that Ms. Bogue failed to properly disclose her spouse's contract with VES in her financial disclosures. Following publication of these articles, on November 17, 2020, the VES president wrote to a then member of the VES board of directors,

> So [Mr. Bogue] and his wife both fear that our cutting his contract makes it look like they are guilty of a conflict of interest and did something wrong. They're saying we should keep him through the year (which is only a few weeks after Thanksgiving and before Xmas). To be perfectly honest, I don't think they're thinking clearly and I don't think they're particularly savvy media-wise. But I am feeling pressure and torn about it all. My inclination is not to upset them and let it go through December….WDYT?

When shown a copy of this email by OIG investigators, Ms. Bogue testified, "I am very surprised that I am [mentioned] in this email because I have never had a conversation with [the VES president] about this matter." In her testimony to the OIG, Ms. Bogue denied ever communicating to anyone at VES that she was concerned about VES terminating her spouse's

---

[36] 5 C.F.R. § 2635.702.

[37] 5 C.F.R. § 2635.702(a).

[38] "Are For-Profit College 'Critics' Up to Their Old Tricks?," National Legal and Policy Center, November 4, 2020, https://www.nlpc.org/government-integrity-project/are-for-profit-college-critics-up-to-their-old-tricks/; "VA Official Charmain Bogue Did Not Disclose Links to Outside Group," National Legal and Policy Center, November 12, 2020, https://www.nlpc.org/government-integrity-project/va-official-charmain-bogue-did-not-disclose-links-to-outside-group/.

Exhibit 6 Page 54

contract or that VES should keep her husband employed. She also denied asking her husband to communicate this to VES. She said that she only had one conversation with her husband about the issue, in which he said the contract was ending, but that she never knew when or why it ended. As previously explained, the OIG requested an interview with the VES president and Mr. Bogue, but both declined to cooperate, so OIG investigators were not able to question them about this email or the referenced communications.

The OIG did not have sufficient information to determine whether Ms. Bogue used her public office for private gain with respect to her husband's contract. The VES president's contemporaneous email indicates that both Mr. and Ms. Bogue asked the VES president not to immediately terminate Mr. Bogue's contract in response to media coverage alleging that Mr. Bogue's contract with VES created a conflict of interest for Ms. Bogue. Ms. Bogue denied such communications and the OIG was unable to question the VES president or Mr. Bogue because neither agreed to a voluntary interview with the OIG.

## The VES President Received a Résumé from Ms. Bogue in November 2020 and Endorsed Her as a Candidate for a Presidential Appointment

On Friday, November 20, 2020, during business hours, Ms. Bogue emailed a copy of her résumé to the VES president from her personal email account, writing, "Use what you need."[39] The VES president replied, "Thanks. That will work. Even better if you create and send me a 1 or 2 page version. But I'll send this in for now." The email exchange did not indicate why Ms. Bogue sent her résumé to the VES president.

The next business day, the VES president sent emails to staff for several US senators and a subcommittee of the House Committee on Veterans' Affairs, with the stated purpose of seeking "help getting good people into the roles overseeing GI Bill and Tuition Assistance." The emails identified Ms. Bogue as a recommended candidate for a presidentially appointed position at VA and some included a two-page version of Ms. Bogue's résumé. Another VES employee sent similar emails to staff for other members of Congress in December 2020 and January 2021.[40] In response to questioning from OIG investigators about the two-page version of the résumé, Ms. Bogue denied ever creating it, and stated that she did not recall ever sending such a version to VES.

---

[39] Emails reflect that Ms. Bogue was working on this day, including sending emails to her staff about Education Service matters from her VA email account shortly before and after sending this email from her personal account.

[40] Separate from the outreach to congressional offices, VES drafted a letter to the incoming administration recommending Ms. Bogue, among others, for presidential appointments. The VES president tasked the organization's then consumer policy director with recruiting other veterans organizations to cosign the letter. However, the consumer policy director told the OIG he received negative responses from such entities and did not complete the task. He stated that he did not discuss with Ms. Bogue or her spouse her inclusion in the letter. The OIG could not determine whether VES ultimately sent the letter.

On December 14, 2020, the VES president emailed Ms. Bogue at her personal email address, providing a link to the job application portion of President Biden's transition team website, with the subject line "please fill this out." Ms. Bogue replied one hour later, "Thanks."

### Ms. Bogue Told OIG Investigators That She Sought Résumé Feedback from the VES President, Not an Endorsement for Potential Positions

Ms. Bogue told the OIG that she did not know that the VES president was going to recommend her for a presidentially appointed position and did not know if the VES president ever did so. According to Ms. Bogue, the VES president reached out to her to ask if she was interested in such a position. Ms. Bogue told OIG investigators her reply was, "the door is never closed on any opportunity." She told the OIG that this statement was neither confirming nor denying her interest in such a position but was simply "a standard answer I give to anyone to be polite."[41] Ms. Bogue further stated that following this conversation, the VES president circled back "at some point and said I would actually need to apply for a position." Ms. Bogue indicated that she never in fact applied for any presidentially appointed position.

Ms. Bogue told the OIG that she sent her résumé to the VES president for two purposes: to get feedback on her résumé to make her a better candidate for nonpolitical federal government jobs, which she was applying to at the time, and "to improve just overall from a professional standpoint." When asked about the meaning of "use what you need" in this context, she replied, "So everyone has their own perception of the phrase, but I [said] use what you need in terms of I needed to create a different version or make it more jazzy, use what you need."

The OIG could not reconcile Ms. Bogue's testimony about the reason she provided her résumé to the VES president with seemingly contrary documentary evidence. However, the OIG concluded that it was not necessary to determine whether Ms. Bogue was seeking VES's endorsement because the explanation she provided to OIG investigators for sharing her résumé with the VES president also implicated the apparent conflict rule.

### Participating in VES Matters after Purportedly Seeking Résumé Advice from the VES President Violated the Apparent Conflict Rule

The apparent conflict rule required Ms. Bogue to evaluate whether her impartiality could reasonably be questioned in addressing VES-related matters after seeking feedback on her résumé from the VES president.[42] Until early January 2021, Ms. Bogue had a covered

---

[41] Ms. Bogue told OIG investigators that she had "five or six individuals" reach out to her asking if she would be interested in a presidentially appointed position.

[42] 5 C.F.R. § 2635.502(a).

Exhibit 6 Page 56

relationship with VES because her spouse still served as a contractor for the nonprofit.[43] Although Ms. Bogue received approval to work on VES-related matters under certain conditions, she did not disclose to her then supervisors that she would ask the VES president for assistance in editing her résumé to improve her career prospects. Because she did not disclose all the relevant facts, her supervisors' approval did not encompass this situation.[44] Consequently, the apparent conflict rule obligated Ms. Bogue to answer for herself whether a reasonable person with knowledge of all the relevant circumstances—including that she asked the VES president for assistance in improving her résumé, in order to be a better candidate for federal positions she was actively pursuing—could question her impartiality when addressing VES's later requests to the Education Service.[45]

Evidence reviewed by OIG investigators reflects that Ms. Bogue continued to participate in at least one VES-related matter, the VBA-NSC data-sharing project, in the period immediately after November 2020. In December 2020, the VES president reported to a Census Bureau official via email that she had exchanged text messages with Ms. Bogue, seeking her assistance in moving forward VBA's production of data under the MOU with the NSC. According to the VES president's email, Ms. Bogue reported progress, noting that the release of data was awaiting internal review. In her sworn testimony, Ms. Bogue told OIG investigators she did not recall having a conversation or text exchange with the VES president around this period, but did recall having conversations with the VES president about the MOU more generally.

Ms. Bogue told the OIG she did not contemplate how it might appear when addressing VES-related matters after seeking résumé feedback from the VES president. She also indicated that she did not disclose these circumstances to anyone at VA. Accordingly, her continued participation in VES-related matters was not consistent with her obligations under the apparent conflict rule.

In addition to the apparent conflict rule, Ms. Bogue's conduct also implicated the prohibition against using her public office for private gain.[46] Ms. Bogue had authority over VES requests to the Education Service, and she told OIG investigators that she had no relationship with the VES president outside of her official duties. Accordingly, Ms. Bogue may have sought and obtained the favor of résumé feedback from the VES president by virtue of her position as executive director of the Education Service.[47] However, the VES president would not agree to an

---

[43] 5 C.F.R. § 2635.502(a).

[44] 5 C.F.R. § 2635.502(c).

[45] 5 C.F.R. § 2635.502(c).

[46] 5 C.F.R. § 2635.702.

[47] 5 C.F.R. § 2635.702(a).

Exhibit 6 Page 57

interview, and Ms. Bogue failed to complete her follow-up interview. As a result, the OIG lacked sufficient evidence to substantiate whether Ms. Bogue violated this rule in this instance.[48]

## Finding 2 Conclusion

A series of emails from November 2020 raised additional ethics concerns not identified by Senator Grassley's initial referral to the OIG. In particular, the OIG identified an email suggesting that Ms. Bogue may have used her public office for private gain by requesting that VES delay the termination of her husband's contract. Additionally, Ms. Bogue provided her résumé to the VES president, who promptly thereafter included it in a package of candidates recommended to congressional staffers for potential presidential nomination. Ms. Bogue denied communicating with the VES president about her husband's contract and she denied being aware that the résumé she provided would be used to recommend her for appointments. Instead, Ms. Bogue explained that she was seeking résumé feedback from the VES president. This explanation created other appearance concerns that required her to evaluate her impartiality, but she failed to do so. Additionally, this conduct implicated rules against using one's public office for private gain.

The OIG substantiated that Ms. Bogue failed to comply with an ethics rule relating to the appearance of a conflict of interest but could not substantiate whether she used her public office for private gain, in part because non-VA witnesses declined requests for interviews and Ms. Bogue refused to complete her follow-up interview.

## Finding 3: Ms. Bogue Provided Insufficient Detail about Her Spouse's Business in 2019 and 2020 Public Financial Disclosures but Remedied It

In response to Senator Grassley's referral, the OIG also reviewed whether Ms. Bogue committed errors in her public financial disclosures as they related to her spouse's firm. As required by federal law, Ms. Bogue disclosed certain information about her husband's business activities in her annual public financial disclosure reports.[49] Although her 2019 and 2020 reports were certified by agency ethics counsel as compliant with the applicable rules, later review by VA ethics officials revealed that Ms. Bogue failed to report some required information concerning her husband's business. Working with VA ethics counsel, she remedied that deficiency in her 2021 financial disclosure report.

---

[48] Depending on the facts and circumstances, soliciting favors such as résumé editing could also implicate the ethics rules pertaining to gifts. If a favor had a monetary value, Ms. Bogue could not solicit it from a prohibited source such as VES. 5 C.F.R. § 2635.202(a).

[49] 5 U.S.C. App. 4, §§ 101(a), (f)(3), 102.

Ms. Bogue was required to file annual public financial disclosure reports beginning in 2019 because of her promotion to the senior executive service. She told the OIG that she was not required to file any financial disclosure reports before that time. In her 2019 and 2020 reports, Ms. Bogue wrote that her spouse was "Self-Employed (Consulting Firm)" and that his income type was "salary, consulting fees." She did not report the amount of income he received. Agency ethics counsel reviewed each of these disclosures and certified them as compliant with applicable law.[50]

Ms. Bogue emailed VA ethics counsel in April 2021, stating that "[d]ue to recent events, I want to verify that I am not missing anything or should I be doing more when it comes to [the spousal] section of the disclosure." VA ethics counsel replied that, "In past years, you reported your spouse was self-employed (consulting firm). However, if he operates a business, owns an LLC or other entity, this should be reported as a business."[51] To comply with the disclosure rules, VA ethics counsel advised that Ms. Bogue "report the business name and the type of business being conducted." In a later discussion, VA ethics counsel indicated that Ms. Bogue must report the name, nature, and value of her spouse's business, as well as the type of income received from it. Ms. Bogue fulfilled these requirements in her 2021 financial disclosure report, and agency ethics counsel certified that the report "complie[d] with disclosure laws and regulations."

Ms. Bogue told the OIG that prior to allegations of error with respect to her financial disclosures, she believed she was properly reporting information about Mr. Bogue's business. She testified that she told agency ethics counsel her spouse had a consulting firm but was not informed about the additional disclosures that were required until April 2021. She stated that she was not asked to amend her 2019 or 2020 reports.[52]

## Finding 3 Conclusion

In her 2019 and 2020 public financial disclosure reports, Ms. Bogue incorrectly described her spouse's limited liability company business as self-employment. Agency ethics counsel did not alert her to the error, but rather certified these disclosures as compliant with the applicable rules.

---

[50] With respect to spousal income, a filer must report, among other things, "[t]he source of items of earned income earned by a spouse from any person which exceed $1,000. . ., except that, with respect to earned income (other than honoraria), if the spouse is self-employed in business or a profession, only the nature of such business or profession need be reported." 5 U.S.C. App. 4, § 102(e)(1)(A); *see also* 5 C.F.R. § 2634.311(a)(1)(i). The filer need not report the amount of the spouse's earned income. 5 C.F.R. §§ 2634.311(a)(1)(i), (3), 2634.301(a).

[51] For a spouse's small business, the regulations refer the filer to the disclosure requirements that would apply if the filer had the spouse's interest in the business. 5 C.F.R. § 2634.311(a)(3). Those include disclosing the name of the business and its approximate value. 5 C.F.R. § 2634.301(a)-(b). Additionally, the filer must report the type of income their spouse earns from the business and, if other than earned income, the approximate amount. 5 C.F.R. § 2634.311(a)(1). Although it was not identified in her prior financial disclosures, the fact that Mr. Bogue owned and operated his consulting firm, and had VES as a client, was publicly disclosed through the firm's website.

[52] OGE's Public Financial Disclosure Guide permits filers to amend reports after they are certified by agency ethics officials. OGE Public Financial Disclosure Guide, Part 5, at 268–69 (January 2019). However, the guide does not expressly require post-certification amendment.

When Ms. Bogue was later advised that her prior disclosures were inadequate, she remedied the issue in her 2021 disclosure with the assistance of agency ethics officials.

## Finding 4: Ms. Bogue Refused to Cooperate Fully in the OIG's Investigation

Federal law requires that all VA employees cooperate in OIG investigations. Under the Inspector General Act of 1978, the OIG may request any information or assistance necessary to carry out its duties from agency employees, including obtaining the sworn testimony of those employees.[53] Further, VA regulation and policy require its employees to cooperate with OIG requests for testimony.[54] The agency's regulation provides,

> Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be ground for disciplinary action. An employee, however, will not be required to give testimony against himself or herself in any matter in which there is indication that he or she may be or is involved in a violation of law wherein there is a possibility of self-incrimination.[55]

VA Deputy Secretary Remy also sent an email to all VA employees in December 2021, reminding them of their obligation to cooperate in OIG investigations, as part of VA's efforts to improve employee engagement generally with the OIG. The OIG conducted an initial interview of Ms. Bogue on April 15, 2021. Consistent with their typical investigative process, OIG investigators issued subpoenas for the production of documents to non-VA entities and began interviewing other witnesses. While this work was occurring, Ms. Bogue informed the OIG that she would be on family leave from August through November 2021. In October 2021, the OIG requested a follow-up interview through Ms. Bogue's counsel to be scheduled once she returned from leave.

OIG investigators began the follow-up interview on December 8, 2021, the date to which her counsel first concurred following the end of Ms. Bogue's family leave. At the end of that session, they explained that they had not completed their questioning and required an additional session. The additional session was needed because the interview had proceeded more slowly than anticipated in light of the amount of material to be discussed and instances of Ms. Bogue's noncooperation, such as disputing whether the OIG investigators' questions were relevant,

---

[53] 5 U.S.C. App. 3. § 6(a)(3).

[54] 38 C.F.R. § 0.735-012(b); VA Handbook 5025, *Legal*, Part III.4.b, April 15, 2002.

[55] 38 C.F.R. § 0.735-012(b).

Exhibit 6 Page 60

refusing to answer questions, and repeating nonresponsive answers. The OIG and Ms. Bogue, through counsel, scheduled this additional session for Monday, December 27, 2021.

On Monday, December 21, 2021, Ms. Bogue tendered her resignation to her supervisor, effective January 15, 2022.[56] On Thursday, December 23, 2021, Ms. Bogue's counsel emailed OIG investigators to advise that Ms. Bogue refused further voluntary participation in the investigation, including participating in the December 27, 2021, interview session. OIG investigators replied on December 27, 2021, advising counsel of Ms. Bogue's obligation to "furnish information and testify freely" pursuant to VA regulation, subject to her assertion of her Fifth Amendment right against self-incrimination as to specific questions, and requesting that the interview be completed by December 28, 2021.

Ms. Bogue's counsel responded later that day, contending that Ms. Bogue completed her prior interview and that the OIG was requesting a third interview.[57] Counsel further asserted that the OIG could not compel Ms. Bogue's participation in an interview unless the OIG provided immunity from prosecution by issuing a *Kalkines* warning.[58] Counsel noted, "To the extent [Ms. Bogue] is required to 'assert' her Fifth Amendment right, she does so."

Ms. Bogue's refusal to participate in the balance of her follow-up interview was inconsistent with her duties as a VA employee. The law obligated Ms. Bogue to complete the OIG's interview. While she had the right to assert her Fifth Amendment protection against self-incrimination during the interview, wholesale refusal to participate in the interview was not permitted. Regardless of the matters under review, VA employees must cooperate with OIG investigations to ensure the OIG can fulfill its mission to conduct effective, independent oversight concerning VA's programs and operations and recommend corrective action where needed.[59]

## Finding 4 Conclusion

Ms. Bogue refused to complete her follow-up interview with the OIG. This amounted to a deliberate disregard of her duties as a VA employee. Her refusal hindered the OIG's investigation and, by extension, its efforts to fulfill its statutory oversight mission.

---

[56] The OIG did not learn of Ms. Bogue's resignation until January 5, 2022.

[57] As noted above, the second interview concluded with an on-the-record acknowledgment that it was incomplete and needed to be continued. However, this is a distinction without a difference because had the OIG requested a third interview, Ms. Bogue would still have had an obligation to cooperate.

[58] *Kalkines v. U.S.*, 473 F.2d 1391 (Ct. Cl. 1973). A *Kalkines* warning advises an employee that the investigation is purely administrative in nature, and that any information provided cannot and will not be used against the witness in any subsequent criminal proceedings. Issuing a *Kalkines* warning to a VA employee is not a standard OIG practice and, in light of VA's regulation obliging employees to testify freely, not required to ensure their attendance at interviews. Further, granting immunity from prosecution is a decision made by the Department of Justice.

[59] 5 U.S.C. App. 3. § 2(1)-(3).

# Conclusion

The OIG investigated allegations by Senator Charles E. Grassley that Charmain Bogue, former executive director of VBA's Education Service, may have operated under a conflict of interest in light of her spouse's work for VES and may have failed to properly disclose information about her spouse's business in her public financial disclosures.

With respect to the first allegation, the OIG found that Ms. Bogue regularly participated in VES-related matters while her spouse worked as a consultant for that organization. The OIG determined that Ms. Bogue failed to comply with rules governing the appearance of a conflict of interest in at least two instances prior to May 2019 when she took actions that benefitted VES without considering whether her impartiality would be questioned in the matter. After reportedly receiving supervisors' permission to work on VES-related matters in May 2019 so long as there was no related contract or MOU, Ms. Bogue also violated the apparent conflict rule when she participated in the approval of a data-sharing MOU that benefited VES.

The OIG further found that it could not substantiate the existence of an actual conflict of interest based on the available evidence. Mr. Bogue received a large payment at the end of his tenure in excess of his usual monthly fee. The evidence was insufficient to determine the basis for this larger payment, in part because of the refusal by the VES president and Mr. Bogue to fully cooperate with the investigation.

The OIG also investigated two other issues, not included in the original referral, which raised potential ethical concerns. First, according to a November 2020 email from the VES president, Ms. Bogue intervened to stop VES from immediately terminating her spouse's contract following the publication of news articles alleging a conflict of interest. In her interview with OIG investigators, Ms. Bogue denied asking the VES president to delay terminating her husband or asking him to communicate that request to VES. Because Mr. Bogue and the VES president declined to be interviewed, and lacking other evidence, the OIG could not substantiate whether Ms. Bogue in fact interceded in her spouse's termination, which would have violated the ethics rule against using one's public office for private gain.

Second, Ms. Bogue sent her résumé to the VES president, who then endorsed her for a presidential appointment. According to Ms. Bogue, she provided the résumé to receive feedback to improve her candidacy for other career federal jobs and did not know about the endorsement. The OIG could not determine whether Ms. Bogue's explanation was accurate. However, the OIG found that, even if Ms. Bogue's own explanation was taken to be true, the exchange created a risk that a reasonable person might question Ms. Bogue's impartiality in dealing with VES in the future. Ms. Bogue failed to evaluate whether her recusal was required in subsequent VES-related matters and therefore violated the apparent conflict rule.

Additionally, with respect to Senator Grassley's referral that included allegations that Ms. Bogue's financial disclosures may have been deficient, the OIG found that Ms. Bogue

Exhibit 6 Page 62

provided insufficient information about her spouse's business in her 2019 and 2020 disclosures. These disclosures were, however, certified by VA officials. This issue was remedied in her 2021 disclosure.

Finally, Ms. Bogue refused to complete a follow-up interview with the OIG. This was a direct violation of her duties under federal law and VA regulation and policy. It also hampered the OIG's ability to address the allegations under review. While Ms. Bogue retained the right to assert her Fifth Amendment protection against self-incrimination during the interview, blanket refusal to participate was not allowed.

Ms. Bogue resigned from VA in January 2022. As a result, the OIG makes no recommendations with respect to her conduct.

Exhibit 6 Page 63

# VA Comments and OIG Response

VBA's deputy under secretary for policy and oversight, provided a written response to this report in which he concurred with the OIG's findings without comment. A copy of VA's response is included in appendix B. In light of VA's full concurrence, the OIG has no further response.

Exhibit 6 Page 64

# Appendix A: Scope and Methodology

## Scope

The OIG's review period extended back to December 2017 and ended in January 2022.

## Methodology

The OIG reviewed applicable laws, regulations, policies, and procedures. Additionally, the OIG collected and reviewed emails and other records of Ms. Bogue and her prior first-line supervisor, the former principal deputy under secretary for benefits. Finally, through the issuance of subpoenas the OIG collected and reviewed emails and other records of VES and Mr. Bogue's consulting firm.

OIG investigators interviewed 15 individuals, including Ms. Bogue, the former principal deputy under secretary for benefits, Education Service staff, other relevant VA employees, and former VES employees. The OIG requested to interview the VES president and Mr. Bogue. Those individuals declined to be interviewed, hampering the OIG's fact-finding ability. Additionally, Ms. Bogue refused to cooperate in completing a follow-up interview with the OIG, which further hindered its investigation. Further, the former under secretary for benefits did not respond to the OIG's repeated requests for an interview.

## Scope Limitations

Senator Grassley's April 2, 2021, letter raised several allegations in addition to those addressed in this investigation. Those allegations included

- VA's alleged mitigation of penalties recommended in disciplinary actions against specific senior-level VBA employees;

- the potential disclosure of material non-public information concerning a 2020 Education Service matter relating to potential action against five educational institutions accused of deceptive or misleading marketing practices;

- VA employees' compliance with financial disclosure requirements;

- VA's compliance with Freedom of Information Act requests; and

- allegations of reprisal by unnamed VA officials against unnamed VA employees who provided unspecified information to Senator Grassley's office.

The OIG did not review these allegations at this time for several reasons, including that the allegations could be more fully addressed by other offices, executive agencies, or the courts; that some of the allegations lacked the specificity needed to conduct a meaningful review; and that the allegations sought broad reviews of systems outside the scope of the specific allegations raised in regard to Ms. Bogue.

This administrative investigation arose from allegations that the relationship between Mr. Bogue and VES potentially gave rise to an actual or apparent conflict of interest for Ms. Bogue. That relationship lasted over two years and involved many VES-related matters before the Education Service. The OIG did not audit each matter related to or involving VES during that two-year period. Rather, the matters discussed in this report reflect those most relevant under application of the ethics rules.

## Government Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Investigations.*

# Appendix B: VA Management Comments

## Department of Veterans Affairs

## MEMORANDUM

Date: March 11, 2022

From: Deputy Under Secretary for Policy & Oversight (20PO)

Subj: OIG Draft Report – Former Education Service Executive Violated Ethics Rules and Her Duty to Cooperate Fully with the OIG

To:     Assistant Inspector General for Special Reviews (56)


1. Attached is VBA's response to the OIG Draft Report: Former Education Service Executive Violated Ethics Rules and Her Duty to Cooperate Fully with the OIG.

2. Questions regarding the contents of this memorandum may be directed to [redacted].


Ronald S. Burke, Jr.
Deputy Under Secretary
Office of Policy & Oversight
Department of Veterans Affairs


Attachment

**Veterans Benefits Administration (VBA)**

**Comments on OIG Draft Report**
**Former Education Service Executive Violated Ethics Rules and Her Duty to**
**Cooperate Fully with the OIG**

**VBA provides the following comments:**

VBA concurs without comment on OIG's findings and acknowledges that the Draft Report contained no recommendations with respect to Ms. Bogue's conduct, as she resigned from VA in January 2022.

**The following comments are submitted in response to the recommendation in the OIG draft report:**

Finding 1: Ms. Bogue Participated in Matters Involving Her Spouse's Employer without Considering An Apparent Conflict of Interest and Acted Contrary to Ethics Guidance She Received

VBA Response: Concur.


Finding 2: Ms. Bogue's Interactions with the VES President Violated the Apparent Conflict Rule but the OIG Cannot Substantiate Whether She Used Her Public Office for Private Gain

VBA Response: Concur.


Finding 3: Ms. Bogue Provided Insufficient Detail about Mr. Bogue's Business in 2019 and 2020 Public Financial Disclosures but Remedied It.

VBA Response: Concur.


Finding 4: Ms. Bogue Refused to Cooperate Fully in the OIG's Investigation

VBA Response: Concur.

# OIG Contact and Staff Acknowledgments

| | |
|---|---|
| **Contact** | For more information about this report, please contact the Office of Inspector General at (202) 461-4720. |
| **Primary Contributors** | Christopher Bader, Senior Investigative Attorney<br>Domingo Alvarez, Senior Administrative Investigator<br>Amanda Kostner, Supervisory Investigative Attorney<br>Patrick McMullen, Senior Investigative Attorney |
| **Other Acknowledgments** | Michael Dinet, Investigative Attorney<br>Dillon Fishman, Senior Special Agent<br>Silvia Gonzalez-Roman, Supervisory Investigative Attorney<br>Sabrina Gregory, Forensic Auditor<br>David Hendrickson, Senior Administrative Investigator<br>Lisette Howells, Supervisory Investigative Attorney<br>Charles Millard, Senior Administrative Investigator<br>Laura Owen, Senior Management and Program Analyst<br>Clifford Stoddard, Attorney-Advisor |

Exhibit 6 Page 69

Former Education Service Executive Violated Ethics Rules and Her Duty to Cooperate Fully with the OIG

# Report Distribution

## VA Distribution

Office of the Secretary
Veterans Health Administration
Assistant Secretaries
General Counsel

## Non-VA Distribution

House Committee on Veterans' Affairs
House Appropriations Subcommittee on Military Construction, Veterans Affairs,
   and Related Agencies
House Committee on Oversight and Reform
Senate Committee on Veterans' Affairs
Senate Appropriations Subcommittee on Military Construction, Veterans Affairs,
   and Related Agencies
Senate Committee on Homeland Security and Governmental Affairs
National Veterans Service Organizations
Government Accountability Office
Office of Management and Budget
U.S. Senate: Charles E. Grassley

Exhibit 6 Page 70